## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNIVERSITY LEGAL SERVICES-
   PROTECTION AND ADVOCACY, INC.
   220 I STREET, NE SUITE 130
   WASHINGTON, DC 20002

                                        CIV. NO: 1:04CV01021


                                Plaintiffs,

v.

JOHN STUPAK, ACTING DIRECTOR
   NORTHWESTERN HUMAN SERVICES,
      in his official capacity,

            and

MARTHA B. KNISLEY, DIRECTOR,
   DISTRICT OF COLUMBIA DEPARTMENT OF
   MENTAL HEALTH,
      in her official capacity,


                                Defendants.


## PLAINTIFF'S AMENDED MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, University Legal Services - Protection and Advocacy Program ("ULS-P&A"),

submits this Memorandum of Law in support of its Motion for a Preliminary Injunction.  ULS-

P&A requests this Court to enter a preliminary injunction, pursuant to 42 U.S.C. § 1983 and/or

the Protection and Advocacy for Individuals with Mental Illness ("PAIMI") Act, 42 U.S.C.

10801 et seq., enjoining Defendants, Martha B. Knisley, Director of District of Columbia

Department of Mental Health ("DMH") and John Stupak, Acting Director of Northwestern

1

Human Services ("Northwestern") from denying ULS-P&A records within Defendants' possession concerning persons provided mental health services overseen by DMH ("consumers of mental health services") to which ULS-P&A has a statutory right under the PAIMI Act.

Under the PAIMI Act, ULS-P&A, as the designated protection and advocacy (P&A) agency for the District of Columbia, has a mandate to investigate incidents of abuse or neglect where it has probable cause to suspect such incidents have occurred, and a right to promptly access records and other information relevant to such incidents. ULS-P&A has probable cause to suspect that numerous consumers of mental health services have been subject to abuse or neglect as a result of mismanagement of their Social Security disability funds and other funds by Northwestern, a service provider certified by the District of Columbia to deliver services on behalf of the District. The effects of these actions are particularly severe because many such consumers are homeless and dependent upon Defendants for their protection and support.

Defendants have denied ULS-P&A's repeated requests for records and other information necessary to investigate such abuse and neglect, including investigation reports prepared by DMH concerning these incidents, individual records of the consumers, and the identities and contact information for the consumers and their guardians. Without this information, Plaintiff is unable to fulfill its statutory mandate to investigate incidents of abuse and neglect, and Plaintiff and its constituents – vulnerable people with mental illness – will suffer irreparable harm.

Accordingly, Plaintiff requests that this Court enter a preliminary injunction, pursuant to 42 U.S.C. § 1983 and/or 42 U.S.C. § 10801 et seq., ordering Defendants to provide ULS-P&A with the following, within three days:

1. the identities and contact information of people with mental health needs (and for their

guardians, if any) who received services from Northwestern from May, 2002, to the present, for whom (1) staff at Northwestern or Northwestern itself acted as representative payee for Social Security benefits or for whom (2) Northwestern held funds or had authority over some or all of their funds;

2. any and all DMH investigation reports concerning allegations of financial mismanagement by Northwestern, and the related corrective action plans (and/or any response provided by Northwestern), as well as any subsequent investigation findings or recommendations, and any records received and/or reviewed or prepared by DMH in preparing the report, including but not limited to records which describe persons who were interviewed, physical and documentary evidence, records prepared or maintained by Northwestern evidencing who provided services to the consumers, when, and how often, and any reports concerning or responsive to allegations that Northwestern financially mismanaged consumers' funds prepared;

3. for individuals for whom ULS-P&A has presented authorizations, any and all records requested in attached exhibits 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, and 16, which are within the possession or control of Defendants or their agents;

4. any and all requested records of individual consumers of mental health services that received  services from Northwestern, including any correspondence and internal memoranda related to financial mismanagement, financial and billing/invoicing records for services provided to and housing for clients, and any records or documents related to Northwestern or its staff's actions as representative payee, which are within the possession or control of Defendants or their agents, for whom individual authorization has been or will be provided;

3

5. any and all records of individuals identified in para. 1, <u>supra</u>, including any correspondence and internal memoranda related to financial mismanagement, financial and billing/invoicing records for services provided to and housing for clients, and any records or documents related to Northwestern's or its staff's actions as representative payee, which are within the possession or control of Defendants or their agents, for whom authorization is not required under the PAIMI Act because those individuals do not have guardians and are unable to authorize their release as well as those for whom their guardian is an agency of the District of Columbia.

Additionally, the Court should issue a declaratory judgment that the Defendants, in denying timely access to the records, have violated the rights of Plaintiff. Further, the Court should enjoin Defendants from engaging in similar acts in the future, award attorneys fees to Plaintiff and assess costs against both Defendants and award such further relief at law and in equity that the Court deems to be proper.

## INTRODUCTION

ULS-P&A has a federally protected right to obtain certain information in order to protect vulnerable persons with disabilities. It has instituted this action to redress the Defendants' denial of certain documents. The PAIMI Act, 42 U.S.C. §§10801-10827, provides each state's protection and advocacy system the right to access records in order to fulfill the statute's purpose: "to ensure that the rights of individuals with mental illness are protected." 42 U.S.C. § 10801(b)(1).

Defendants have unlawfully denied ULS-P&A certain records which ULS-P&A has requested for the purpose of protecting these individuals and investigating whether they have

been subject to abuse and neglect. Time is critical because it is believed that the documents and information requested will enable ULS-P&A to protect the individuals from further neglect both by: (1) monitoring the transition of these vulnerable individuals from Northwestern to a new service provider – Northwestern is scheduled to close on June 30, 2004, and (2) enabling ULS-P&A to ensure that Northwestern provides restitution to these seriously needy individuals, many of whom are homeless and without sufficient assets to purchase appropriate food and shelter. Delay will cause irreparable harm to ULS-P&A because without prompt access to the records, it will be unable to effectively assist these needy individuals.

The PAIMI Act was enacted in 1986 to establish independent protection and advocacy systems ("P&As") nationwide with authority to protect individuals with mental illness from abuse and neglect. 42.U.S.C. § 10801(b)(2)(A), (B). Congress established P&As in response to the myriad of accounts of abuse and neglect against individuals with mental illness that were substantiated by Congressional investigations. Congress found that "individuals with mental illness are vulnerable to abuse and serious injury" as well as "neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning." 42 U.S.C. § 10801(a)(1),(3). Moreover, Congress found that "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate." 42 U.S.C. § 10801(a)(4). [1]

---

[1] In 1975, prior to enacting the PAIMI Act, Congress adopted the Developmental Disabilities Assistance and Bill of Rights ("DD") Act to protect the human and civil rights of individuals with developmental disabilities. 42 U.S.C. §§ 6000 et seq. This Act was repealed and entirely replaced by the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. §§ 15001 et seq. The PAIMI Act, which is modeled after the 1975 DD Act, provides parallel protections for individuals with mental illness using the same mechanisms as the DD Act.

Accordingly, Congress granted P&As the power to investigate incidents of abuse and

neglect of persons with mental illness if the incidents are reported to P&As or if P&As have

probable cause to believe that incidents have occurred.  42 U.S.C. § 10805(1)(A).  To meet this

objective, Congress gave P&As the broad authority, under certain circumstances, to access *all*

records of individuals with mental illness.  42 U.S.C. § 10805(a)(4).  Such records, which must

be made available to the P&A, provided the statutory requirements are satisfied, include

"reports prepared by any staff of a facility rendering care and treatment or reports prepared by an

agency charged with investigating reports of incidents of abuse, neglect and injury occurring at

such facility that describe incidents of abuse, neglect, and injury occurring at such facility and

the steps taken to investigate such incidents . . .."  42 U.S.C. § 10806(b)(3)(A).

As will be explained in the Statement of Facts, *infra.*, Northwestern Human Services is a

service provider to persons with mental illness, doing business in the District of Columbia and

_____

Under an additional statutory program (established under the Rehabilitation Act), the
Protection and Advocacy for Individual Rights Program ("PAIR"), P&As are authorized to use
the same mechanisms as provided under the DD Act to serve persons with disabilities who are
not eligible under either the DD or PAIMI Act.  29 U.S.C. 794e.

It was Congress' intent that the DD and PAIMI Acts and PAIR Program be applied in a
like manner.  See S. Rep. No. 109, 99th Cong., 1st Sess. 3 (1986); S. Rep. 113, 100th Cong., 1st
Sess. 24 (1987), 1987 U.S.C.C.A.N. 781, 803-04; Alabama Disabilities Advocacy Program v.
Tarwater Developmental Ctr., 894 F. Supp. 424, 428 (M.D. Ala. 1995), affirmed, 97 F.3d 492
(11th Cir. 1996).  Accordingly, the case law interpreting one program's access provisions is
equally applicable with respect to the interpretation of the counterpart provisions in a sister
program.  Advocacy Inc. v. Tarrant Count Hospital District, 2001 WL 1297688, at *2, fn. 4
(N.D. Tx. 2001) ("Because the acts are virtually identical and further the same goal - protecting
the rights of vulnerable individuals - judicial interpretation of provisions in  42 U.S.C. § 15043
are useful for questions raised under a comparable provision in [the PAIMI Act]." ); The
Advocacy Center v. Stalder, 128 F. Supp. 358, 360 fn 2 (M.D. La. 1999) ("case law under the
DD Act is helpful to the court in determining right to access under the [PAIMI] Act").

certified by the District of Columbia to deliver services on behalf of the District. Northwestern's role was to deliver services as an Assertive Community Treatment ("ACT") team, providing what was supposed to be intensive, integrated treatment for consumers with serious and persistent mental illness. 22 DCMR 3423.1. Northwestern is going out of business in the District on June 30, 2004. The transition from Northwestern to another service provider will be especially difficult for this group of persons with severe mental health problems.

According to DMH preliminary investigation findings, Northwestern neglected its mental health consumers, failing to account for missing consumer funds and acting negligently in its position as Social Security representative payee[2] for its consumers, since consumers' funds were mishandled. Interests of particularly vulnerable mental health consumers are at stake.

In February, 2004, ULS-P&A became aware of an investigation report prepared by DMH, which resulted in a corrective action plan to be implemented by Northwestern. Nevertheless, when ULS-P&A requested a copy of the investigation report and the corrective action plan and supporting documentation, DMH denied access to the report, insisting that it could not provide any documents until DMH had completed its investigation entirely. Similarly, Northwestern has not provided ULS-P&A with these requested documents.[3]

ULS-P&A also requested names and contact information for the consumers who were

---

[2]If true, such action is especially reprehensible because the representative payee acts as a fiduciary for the individual. He or she is selected by the Commissioner of Social Security because "the interest of [the] individual would be served thereby . . ." and payments are made to the representative payee "for the use and benefit of the individual . . .." 42 U.S.C. § 1383(a)(2)(ii)(I).

[3]After ULS-P&A called DMH on June 18, 2004, pursuant to this Court's Local Rule 7(m) to confer concerning ULS-P&A's imminent filing of the Motion for Preliminary Injunction, DMH released a copy of a DMH report concerning Northwestern.

impacted by Northwestern's potentially abusive or negligent conduct. DMH refused to provide

this information, claiming release would violate the consumers' privacy rights.

Under the PAIMI Act, ULS-P&A has a right to the requested documents and believes

serious harm will come to the mental health consumers if ULS-P&A cannot obtain the

documents, in order to take further action to protect the consumers' interests. Therefore, ULS-

P&A asks that this Court to order Defendants to provide the requested information immediately.

## STATEMENT OF FACTS

The District of Columbia receives funding from the federal government and, in return,

must designate a protection and advocacy system under the PAIMI Act, 42 U.S.C. 10821,

10801-10827. ULS-P&A is designated by the District of Columbia as the protection and

advocacy system for individuals with disabilities throughout the District. See Exhibit 1, Letter

from The Honorable Mayor Marion Barry to ULS Executive Director Jane Brown of 9/19/96.

On March 25, 2003, ULS-P&A sent a grievance to DMH about Northwestern in which

ULS-P&A asked DMH to investigate Northwestern for certification violations related to one of

ULS-P&A's clients who was homeless, dirty, disheveled, and eating out of garbage cans. See

Exhibit 2, Letter from Valente to Jones of 3/25/03. Ms. Valente has written many letters, made

dozens of phone calls, and participated in several meetings with DMH and Northwestern,

attempting to improve the care and financial management for clients who were served by

Northwestern. See Exhibit 3, Declaration of Celeste Valente, ULS-P&A of 6/17/04, at para. 5.

On or about February 18, 2004, ULS-P&A attended a meeting at which DMH explained

that the Federal Bureau of Investigation and the District of Columbia Office of the Inspector

General were investigating Northwestern for allegations of misuse of consumers' funds for as

many as forty mental health consumers.  Concerns about Northwestern's conduct related to use

of mental health consumers' funds, either as representative payee for the consumers' federal

benefits or as provider of and payee for services.  ULS-P&A also learned that DMH had done its

own investigation and given Northwestern a written investigative report in early 2004, to which

Northwestern was supposed to respond.  See Exhibit 3, Declaration of Celeste Valente, ULS-

P&A, of 6/17/04, at para. 10.

The law of the District mandates that DMH is required by District of Columbia law to

"plan, develop, coordinate, and monitor comprehensive and integrated mental health systems of

care for adults . . . [and to] arrange for all authorized, publicly funded mental health services and

mental health supports for residents of the district, whether operated directly by, or through

contract with, the Department.  D.C. Law 7-1131.04.

Northwestern has been certified by the District to provide services on behalf of the

District, including providing Assertive Community Treatment ("ACT") services to persons with

mental illness.  ACT services are required by regulations to be intensive, integrated treatment

for consumers with serious and persistent mental illness.  22 DCMR 3423.1.  According to a

statement of the Assertive Community Treatment Association (June 10, 2003) found at

www.actassociation.org/actModel/, "clients served by ACT are individuals with serious and

persistent mental illness or personality disorders, with severe functional impairments, who have

avoided or not responded well to traditional outpatient mental health care . . .. Persons served

by ACT often have co-existing problems such as homelessness, substance abuse problems, or

involvement in the judicial system."[4]

On or about March 23, 2004, ULS-P&A sent a letter to DMH Director, Martha Knisley requesting documents, including the names of consumers or their guardians, suspected to be impacted by the alleged financial wrongdoings of Northwestern. The letter also requested DMH's investigation concerning the alleged financial wrongdoing, the corrective action plan, and all other documents in ULS-P&A's possession as a consequence of the investigation.

Specifically, the letter requested:

1. Any and all correspondence to and from Northwestern Human Services and the Department of Mental Health (DMH) concerning the allegations of financial wrongdoing, including the allegation that Northwestern staff mishandled consumers' funds;

2. Any and all correspondence to and from DMH staff concerning DMH's investigation into the allegations of financial wrongdoing;

3. Any and all correspondence to and from Dr. Gleason, former psychiatrist at Northwestern;

4. The names, presently known and as they are discovered, of any guardians or

---

[4]Evidence has shown that ACT is superior to traditional case management in reducing hospitalization, increasing housing stability, and improving consumers' quality of life. Evidence Based Practices, http://www.mentalhealthpractices.org/act_mhpl.html. ACT services are provided by a multi-disciplinary team of approximately 10 members, made up of a psychiatrist and numerous health professionals able to provide comprehensive support, treatment and rehabilitation services including vocational, substance abuse, and occupational therapy. Assertive Community Treatment Association, http://www.actassociation.org/actModel/. The precise services provided depend on the consumer's needs, with 75% of services provided in the community rather than an office setting. The staff to consumer ratio should be approximately 1:10, to allow services to be available 24 hours a day, 7 days a week. Through multiple face-to-face contacts every week with consumers, team members are expected to be familiar with each individual served by the team, allowing the team to provide highly individualized and effective services. National Alliance for the Mentally Ill, National Program Standards for ACT teams. http://www.nami.org/Template.cfm?Section=ACTTA Center&template=/ContentManagement/ContentDisplay.cfm&ContentID=10900.

conservators appointed for consumers suspected to be impacted by the alleged financial wrongdoing;

5.   The names, presently known, of any consumer suspected to be affected by the Northwestern staff's alleged financial wrongdoing;

6.   The names, as they are discovered, of consumers suspected to be affected by the Northwestern staff's alleged financial wrongdoing;

7.   The names of any and all Northwestern staff involved in the alleged financial wrongdoing;

8.   The Office of Accountability investigation concerning the allegations of financial wrongdoing, including the allegation that Northwestern staff mishandled consumers' funds;

9.   Any other DMH investigation concerning the allegations of financial wrongdoing, including the allegation that Northwestern staff mishandled consumers' funds;

10.   Any and all corrective action plans resulting from the allegations of Northwestern's financial wrongdoing; and

11.   Any and all documents in DMH's possession as a consequence of its investigation into the allegations of financial wrongdoing, including, but not limited to, Individual Rehabilitation Plans for each affected consumer, bank records for each affected consumer, and internal Northwestern correspondence related to the allegations of mismanaging consumers' funds.

See Exhibit 4, Letter from Thorner to Knisley of 3/23/04.

On that same date, ULS-P&A wrote to Northwestern requesting similar documents.  See Exhibit 5, Letter from Thorner to McWilliam-Roth of 3/23/04.

On March 26, 2004, ULS-P&A met with representatives of the District of Columbia Office of the Inspector General and the Federal Bureau of Investigation, who confirmed their investigations.  Although they were unwilling to give specific information concerning their investigations, they did describe the scope.  They explained that their investigation would not foreclose ULS-P&A from continuing to work for restitution for the consumers who may have

been victimized.  See Exhibit 3, Declaration of Celeste Valente, ULS-P&A, of 6/17/04 at para.
9.

      An attorney for Northwestern responded to ULS-P&A, asking ULS-P&A to provide
authority for its request.  See Exhibit 6, Letter from Kelley to Thorner of 3/29/04.   DMH
responded to ULS-P&A's March letter by stating that  DMH is actively investigating the various
allegations and because the investigation "is active and ongoing, DMH is not in a position to
send ULS a 'complete copy' of any of the requested information."  See Exhibit 7, Letter from
Knisley to Thorner of 4/14/04.  DMH acknowledged that ULS had authority to request the
information and agreed to provide the documents but required "appropriate authorization from
the consumers in question before releasing any information about a consumer's mental health
treatment."  Id.

      ULS-P&A responded to both of these letters with a long recitation of the protection and
advocacy agency's authority to investigate instances of abuse and neglect and its authority to
obtain records.  See Exhibit 8, Letter from Clark to Kelley of 5/4/04 and Exhibit 10, Letter from
Clark to Sturtz of 5/14/04.  Nevertheless, ULS-P&A did not receive any of the requested
documents.

      Soon after, ULS-P&A learned from DMH that Northwestern was closing, making ULS-
P&A's efforts more urgent.  See Exhibit 3, Declaration of Celeste Valente, ULS-P&A, of
6/17/04 at para. 13.  At the request of DMH, ULS-P&A provided DMH with a detailed letter
explaining ULS-P&A's concerns about the poor services Northwestern had provided in the past
and how critical it was for there to be extensive outreach to these vulnerable consumers who
need ACT team services during the transition.  See Exhibit 9, Letter from Valente to Jones of

4/15/04.

On April 26, 2004, ULS-P&A met with Ms. Knisley and expressed its concerns about Northwestern and its desire to work with DMH to protect the interests of the consumers.  Ms. Knisley directed ULS-P&A to work with Ms. Marcia Jones, Director, DMH Office of Accountability.  See Exhibit 3, Declaration of Celeste Valente, ULS-P&A, of 6/17/04, at para. 11.

On May 5, 2004, undersigned counsel, Mary Nell Clark, called and spoke directly with Ms. Jones and DMH General Counsel, Ms. Anne Sturtz.  Ms. Sturtz explained that DMH would not provide ULS-P&A with any of the requested documents until the DMH investigation was complete.  Ms. Sturtz explained that the investigation must be complete so that no misinformation was provided.  Ms. Clark expressed concern about the delay, given that Northwestern is closing at the end of June.  Ms. Sturtz did not state when the investigation would be complete.

On May 14, 2004, ULS-P&A again asked DMH to release the requested documents; in a ten-page letter, ULS-P&A explained its PAIMI authority, which requires DMH to release the documents.  See Exhibit 10, Letter from Clark to Sturtz of 5/14/04.  In that letter, ULS-P&A described why the P&A needed to receive the documents in order to protect the interests of the vulnerable mental health consumers.

In addition, the May 14, 2004 letter amended ULS-P&As March, 2004 request for documents.[5]  ULS-P&A continued to assert the right to individuals' records for which

---

[5]ULS-P&A amended its third request concerning correspondence with Northwestern's former psychiatrist, Dr. Gleason, and also limited its request for records to those for whom ULS-P&A obtains authorization as required by law.