authorization is not required under the PAIMI act and for the names and contact information of those at Northwestern suspected to be impacted by the financial wrongdoing. See Exhibit 10, Letter from Clark to Sturtz of 5/14/04 at 3.

In addition to the general requests, ULS-P&A sent requests for specific individuals' records to both Northwestern and DMH. See Exhibit 11, Letter from Valente to Booth of 4/8/04; Exhibit 12, Letter from Clark to Kelley of 5/21/04; Exhibit 13, Letter from Clark to Kelley of 6/2/04; Exhibit 14, Letter from Clark to Sturtz of 5/28/04; Exhibit 15, Letter from Clark to Sturtz of 5/28/04; and Exhibit 16, Letter from Valente to Kelley of 5/4/04.[6]

DMH did not respond in writing to these subsequent letters until June 18, 2004.[7] Northwestern responded in an e-mail stating that Northwestern would provide a response in "due course." See Exhibit 17, Letter via email from Kelley to Clark of 5/18/04. After several additional requests, Northwestern agreed to allow ULS-P&A to view some but not all of the records of four clients for whom ULS-P&A presented signed authorization. Nevertheless, Northwestern has not provided all of the records requested.

After ULS-P&A called DMH on June 18, 2004, pursuant to this Court's Local Rule 7(m) to confer concerning ULS-P&A's imminent filing of the Motion for Preliminary Injunction, DMH gave ULS-P&A a copy of a DMH report concerning Northwestern. The report is authored by the DMH's Office of Accountability on February 9, 2004, and is addressed to Ms.

---

[6]These requests asked for documents related to service provision, billing practices, and documentation of the use of consumer's funds.

[7]After ULS-P&A called DMH on June 18, 2004, pursuant to this Court's Local Rule 7(m) to confer concerning ULS-P&A's imminent filing of the Motion for Preliminary Injunction, DMH sent a letter providing an initial set of documents including a copy of a DMH report concerning Northwestern.

14

McWilliams-Roth, the Director of Northwestern Human Services. The report is titled: Preliminary Findings from Focused Review of Your Consumer Records/Corrective Action Required. Its conclusion states:

> Based on the DMH's review of [Northwestern] clinical and financial records and interviews with [Northwestern] staff, DMH is **substantiating** [emphasis in the original] Dr. Gleason's complaint that [Northwestern] lacks documentation for expenditures from consumer accounts where [Northwestern] is the representative payee, has not accounted for missing consumer funds and has little or no documentation of what services [Northwestern] has provided to some consumers. DMH is not making any findings on Dr. Gleason's allegation about improprieties in [Northwestern's] relationship with any landlord or housing operator. We do not have sufficient information to make that determination. DMH finds, however, the [Northwestern] may be inappropriately placing individuals who may need a higher level of residential care in a transitional boarding home.

See Exhibit 18, Letter from Jones to McWilliam-Roth of 2/9/04, ("Preliminary Findings" at 1.)

The allegations of Dr. Gleason, Northwestern's former psychiatrist, were extremely troubling. According to the Preliminary Findings, Dr. Gleason's complaint alleged "although [Northwestern] held large sums of funds for some consumers for whom [Northwestern] served as representative payee, [Northwestern] was not providing appropriate services and was not accurately accounting for funds expended." Id. at 2. Some consumers were homeless despite the fact that Northwestern maintained large sums of money on their behalf. Id. at 4. "He also alleged that [Northwestern] staff has personal relationships with some of the landlords and housing operators from whom consumers rent and that these housing providers are paid exorbitant rents for substandard housing." Id. at 4.

Other disturbing findings include:

> [Northwestern] wrote a check in the amount of $940.00 to [the case manager] from [a consumer's] account for [that consumer's] "November allowance." There is no documentation in [the consumer's] file that [the case manager], who is one of your former case managers, gave this sum of money to him." [Id. at 4.]
>
> [A consumer] is one of two individuals . . . listed in your caseload documents as being homeless at the time of our review despite the large sums of money you manage for [him]. You stated that these individuals do not want housing services; therefore, it is unclear to DMH why [the case manager] paid $520.92 weekly from [the consumer's] account for housing you were reasonably sure he would not use." [Id. at 4]
>
> You have placed at least five (5) consumers . . . in a "transitional" house located at [blacked out location]. In at least three cases, it appears from the records that the consumers may not have lived at the facility at all . . . .." [Id. at 6]

The Preliminary Findings required Northwestern, among other things, to submit a report to the Office of Accountability, listing all consumers whose funds were discovered missing by Northwestern during a November review and information on the amounts of missing funds and method of notifying the consumer. Id. at 7. The letter required Northwestern to "submit your corrective action plan (CAP) to [DMH] no later than February 27, 2004 . . . .." Id. at 9.

The need to identify these mental health consumers is critical at this time. Experts who have worked with individuals with severe mental health issues understand the need for outreach during times of transition, especially transition from one service provider to another. Many of Northwestern's consumers are homeless and may be lost to the system entirely without advocacy on their behalf. See Exhibit 19, Declaration of Maryann Luby, Washington Legal Clinic for the Homeless, of 6/17/04, at para. 11.

Individuals who need ACT services have severe and persistent mental illness such as schizophrenia, psychotic disorders, and bipolar disorder with a history of hospitalization,

16

substance abuse, criminal justice involvement or other indication of high service needs, and as a result of their mental illness, have significant difficulty performing daily living and employment tasks. National Alliance for the Mentally Ill, "National Program Standards for ACT teams," http://www.nami.org/Template.cfm?Section=ACTTACenter&template=/ContentManagement/ContentDisplay.cfm&ContentID=10900. Individuals served by ACT have not responded well to traditional outpatient services in the past, and as a result are often over represented in homeless shelters and jails. Assertive Community Treatment Association, http://www.actassociation.org/actModel/.

ULS-P&A is tremendously concerned about the transition of mental health consumers from Northwestern to other ACT teams and is concerned that some of the consumers will get lost in the transition. ULS-P&A visited Northwestern on June 3, 2004, and at least five of the consumers spoken to were homeless, some of them living on the streets. One of the consumers that ULS-P&A represents is missing. See Exhibit 3, Declaration of Celeste Valente, ULS-P&A, of 6/17/04 at para. 15.

ULS-P&A met with another ACT team, Psychiatric Outreach Services ("POS"), that expects 32 consumers to be transferred to their caseload from Northwestern. As of June 4, 2004, POS had no information about the status of the consumers, where they are living or could be located, whether they had public benefits, and other critical information. As of that date, POS did not know when or how many staff to hire and train to prepare for the influx of the most vulnerable consumers enrolled at DMH. Id. at para. 16. Additionally, because ULS-P&A was not included in planning meetings, or even given timely information, ULS-P&A was not able to advocate for the best settlement for consumers whose public benefits may have been mis-

17

handled. In at least two cases, ULS-P&A was able to view account statements that indicated that homeless consumers had accumulated funds well beyond the income limits for the federal Social Security program. These clients, who have experienced malnourishment and pneumonia while homeless, may lose thousands of dollars that should have been used to meet their needs. Id. at para. 17.

To date, DMH and Northwestern have provided ULS-P&A with only some of the documents; neither have provided timely access to the requested records.

## ARGUMENT

### PLAINTIFF SATISFIES ALL OF THE CRITERIA FOR ISSUANCE OF A PRELIMINARY INJUNCTION

The standards for issuance of a preliminary injunction under FRCP 65(a) are well settled. A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) that imminent and irreparable injury will occur if the relief is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction. Katz v. Georgetown Univ., 246 F.3d 685 (D.C. Cir. 2001); Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-1318 (D.C. Cir. 1998); Washington Metro Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); Fed. R. Civ. P. 65(a).

These factors interrelate on a sliding scale and must be balanced against each other. Serono Labs., Inc. v. Shalala, 158 F.3d at 1318. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." City Fed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995); Washington Metro Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-45 (D.C. Cir. 1977).

Additionally, this balancing test is a flexible one, permitting a court to issue preliminary injunctive relief when the likelihood of success is high, although probability of irreparable harm may be low, and vice versa. Cuomo v. United States Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985); Brown v. Artery Org. Inc., 654 F. Supp. 1106, 1114 (D. D.C. 1987).

Plaintiff satisfies each of the four criteria to warrant a preliminary injunction.

### I.     Plaintiff will Suffer Imminent and Irreparable Injury if the Relief is not Granted

To prevail on a request for preliminary injunction, Plaintiff must demonstrate that they will suffer irreparable harm or injury if a preliminary injunction is not granted. Katz v. Georgetown Univ., 246 F.3d 685 (D.C. Cir. 2001); McVeigh v. Cohen, 983 F.Supp. 215, 218 (D. D.C. 1998); Elzie v. Aspin, 841 F.Supp. 439, 442 (D. D.C. 1993). As the facts discussed above illustrate, Plaintiff's interest is to effectively investigate potential abuse and neglect of vulnerable mental health consumers. Without the requested records, ULS-P&A will simply be unable to conduct its investigation and protect the rights of its vulnerable constituents. Because Northwestern is closing, it is especially critical that the documents sought are provided immediately to Plaintiff to enable it to effectively intervene on behalf of consumers to help ensure appropriate continuity of mental health care and support services.

Virtually every court to examine the issue has held that a P&A suffers irreparable harm, and is thus entitled to preliminary and permanent injunctions, when it is denied access to persons or information it needs to conduct a complete investigation of potential abuse or neglect. E.g., Alabama Disabilities Advocacy Program v. Tarwater Developmental Ctr., 97 F.3d 492 (11th Cir. 1996) (permanent injunction); Mississippi Prot. & Advocacy Sys. Inc. v. Cotten, 929 F.2d 1054 (5th Cir. 1991) (mandatory injunction); Wisconsin Coalition for

19

Advocacy, Inc. v. Czaplewski, 131 F. Supp. 2d 1039 (E.D. Wis. 2001) (action against a nursing home seeking release of records of residents who died as a result of choking on food; preliminary injunction issued requiring the release to the P&A of each and every report, document and other record relating to the deceased patients, including those related to their deaths and any investigation thereof); Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs, L.L.C., 152 F. Supp. 2d 1150 (N.D. Iowa 2001) (investigation of a children's residential psychiatric facility which had engaged in abusive restraint and seclusion practices; court concluded that the P&A had properly found a potential for an immediate threat to the health and safety of all of the residents); Wisconsin Coalition for Advocacy, Inc. v. Busby, No. 02-C-871 (E.D. Wis. Sept. 24, 2003) (granting a permanent injunction, court ordered a county coroner to disclose report on death of an inmate with mental illness, finding that access to coroners' reports is authorized under the PAIMI Act and that such reports must be produced promptly and may not be withheld pending completion of related criminal investigations) (Exhibit 21); Iowa Protection and Advocacy Services, Inc. v. Rasmussen, 206 F.R.D. 630, 2001 WL 1809404 (S.D. Iowa 2002) (permanent injunction barring state certification agency from denying P&A access to its investigative findings regarding a restraint-related death of a facility resident; in granting the injunction, the court gave great weight to the P&A's argument that denial of access to these reports would cause it irreparable harm – i.e., replicating these reports through the P&A's own investigation would be time consuming and costly, and in the case of the committee minutes which had been sought, replication is impossible); Office of Protection and Advocacy for Persons with Disabilities v. Armstrong, 266 F. Supp. 2d 303 (D. Conn. 2003) (permanent injunction against corrections department,

20

upholding P&A's right under the PAIMI Act to access records relating to the suicides of inmates); Advocacy Center v. Stalder, 128 F. Supp. 2d 358 (M.D. La. 1999) (permanent injunction, access to inmates' mental health records needed to investigate inmates' claims of mistreatment).

Moreover, a showing of irreparable injury may be **presumed** in certain instances of civil rights violations. Therefore, "a traditional showing of irreparable harm is not required when a Plaintiff seeks equitable relief to prevent the violation of a federal statute . . .." McKinney v. Town Plan and Zoning Comm'n, 790 F. Supp.1197, 1207, 4 NDLR 57 (D. CT. 1992).

Irreparable harm may be presumed in the present case as in McKinney; ULS-P&A seeks injunctive relief to prevent the violation of the PAIMI Act, a federal civil rights statute. ULS-P&A, like the Plaintiff in McKinney, presents facts sufficient to establish that its rights under PAIMI have been violated. The court in McKinney found that irreparable injury could be presumed because the Plaintiff's rights had been violated under the Fair Housing Act. McKinney, 790 F. Supp. at 1207. The conclusion reached in McKinney should apply with equal force to the application of the investigative access provisions of the PAIMI Act. ULS-P&A has a statutory right to access the records, including reports and names and contact information regarding consumers and their guardians. See 42 U.S.C. §§ 10805(a)(1)(A) and 10805(a)(4)(B). Because Defendants have not disclosed the requested records, ULS-P&A's rights have been violated under its federal statutory mandate to investigate. Thus, this Court should find that ULS-P&A is *per se* irreparably injured.

Similarly other courts have found that violations of federal statutes constitute irreparable injury. Gresham v. Windrush Partners, Ltd. 730 F.2d 1417, 1423-24 (11th Cir. 1984) (finding

21

allegations of discriminatory housing practices may give rise to rebuttable presumption of irreparable injury where the Plaintiff establishes a likelihood of success on the merits); Bolthouse v. Cont'l Wingate Co., Inc., 656 F. Supp. 620, 628-29 (W.D. Mich. 1987). See also Forest City Daly Housing, Inc., v. Town of North Hempstead, 175 F.3d 144, 153 (2d Cir. 1999); Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Township, 996 F.Supp. 409,438-39 (D. N.J. 1998); Stewart B. McKinney Fund. Inc. v. Town Plan & Zoning Comm'n, 790 F. Supp. 1197, 1208 (D. Conn. 1992).

Violations of the PAIMI Act cause ULS-P&A to suffer serious irreparable harm because ULS-P&A is unable to fulfill its statutory duty to investigate suspected incidents of abuse and neglect pursuant to its federal mandate to protect and advocate for persons with mental illness.

The court's analysis in Wisconsin Coalition For Advocacy v. Czaplewski, 131 F. Supp. 2d 1039 (E.D. Wis. 2001) is particularly instructive on the serious harm to the P&A when denied its statutory right to investigate suspected incidents of abuse and neglect by accessing needed records. In Czaplewski, the Plaintiff successfully argued that the defendant's refusal to provide records to which the Plaintiff was entitled frustrated its ability to carry out its mandate to investigate abuse and neglect. Czaplewski, 131 F. Supp.2d at 1050. The court in Czapleswki cited a variety of specific harms to the Plaintiff's ability to conduct a timely investigation. For example, loss of memory inevitably occurs with the passage of time and witnesses may become inaccessible as a result of relocation or death. Also, as a direct result of the Defendant's refusal to provide access to records, potential claims may be lost. Id. at 1050-51. "Perhaps most importantly, the residents on whose behalf it must act bear the risk of injury or death." Id. at 1051. The court was persuaded that the Defendant's refusal to provide the Plaintiff with records

22

that it was entitled to review as part of its responsibilities "in a very real and readily identifiable way, pose[s] a threat to the Plaintiff's being able to discharge its obligations. And no amount of damages will remedy that sustained harm." Id at 1051.

Similarly, Defendants here have prevented ULS-P&A from carrying out its investigatory mandate and from taking steps to protect individuals with mental illness from abuse and neglect. ULS-P&A has the authority to investigate the circumstances surrounding the demise of Northwestern Human Services and the allegations of mismanagement and potentially fraudulent use of mental health consumers' funds.[8] Moreover, ULS-P&A cannot determine the extent of harm to individual consumers or obtain authorizations for the release of consumers' records (where required under the PAIMI Act) without the identities of the consumers and/or their guardians and appropriate contact information. Additionally, ULS-P&A cannot advocate for appropriate services for this vulnerable group with new service providers without this information. Interference with ULS-P&A's efforts to carry out its federal mandate harms ULS-P&A and the individuals it is empowered to protect. If a P&A is denied records for a claim it is investigating, it suffers direct injury to its statutory interests. Advocacy Center v. Stalder, 128 F.Supp. 2d 358, 362 (M.D. La. 1999).

Plaintiff's injuries cannot be compensated by monetary damages. Plaintiff will continue to suffer harm unless the Court grants preliminary injunctive relief and orders Defendants to

---

[8] ULS-P&A does not have to prove that abuse or neglect occurred in order to investigate here and obtain access to records and other information it seeks. "Obviously, [the P&A] does not have to have proof of abuse and neglect at the time it seeks to undertake an investigation; if it had proof of abuse or neglect, no further investigation would be necessary." Md. Disability Law Center v. Mt. Washington Pediatric Hospital, 664 A.2d 16, 23 (Md. Ct. Special App.1995).

23

provide them with access to the records and other information sought.

## II.     Plaintiffs Have a Substantial Probability of Success on the Merits

The likelihood of success on the merits is a key factor that enters into the determination of whether to grant a preliminary injunction. In considering the likelihood of success, "[t]he court is not required to determine the likelihood of success of the movant to a 'mathematical probability.'" Express One Int'l v. United States Postal Servs., 814 F. Supp. 87, 88 (D. D.C. 1992); see also Elzie v. Aspin, 841 F. Supp. 439, 443 (D.D.C. 1993) (granting preliminary injunction where Plaintiff presented a "strong case that he will probably succeed" on the merits with respect to his removal from active duty); C. Wright, A. Miller and M. Kane, 11A Fed. Prac. & Proc. Civ.2d § 2948.

ULS-P&A is a federally funded protection and advocacy system mandated under the PAIMI Act to provide protection and advocacy services for persons with mental illness and to investigate abuse and neglect affecting such persons. See discussion in the Introduction, supra. In pursuit of ULS-P&A's federal authority to investigate suspected incidents of abuse and neglect, the PAIMI Act mandates that ULS-P&A be given access to all records of individuals with mental illness under specified circumstances.

Courts have uniformly upheld the P&A's broad discretion and independence in gaining access to facilities and records for investigative purposes. See, e.g., Center for Legal Advocacy v. Hammons, 323 F.3d 1262 (10th Cir. 2003); Pennsylvania Protection and Advocacy, Inc. v. Houstoun, 228 F.3d 423 (3rd Cir. 2000); Alabama Disabilities Advocacy Program v. J.S. Tarwater Developmental Center, 894 F. Supp. 424 (M.D. Ala. 1995), aff'd 97 F.3d 492 (11th

Cir. 1996); <u>Mississippi Protection & Advocacy System, Inc. v. Cotten</u>, 1989 WL 224953 (S.D. Miss. 1989), <u>aff'd</u>, 929 F. 2d 1054 (5th Cir 1991); <u>Robbins v. Budke</u>, 739 F.Supp. 1479 (D.N.M. 1990); <u>Michigan Protection & Advocacy Service, Inc. v. Miller</u>, 849 F. Supp. 1202 (W.D. Mich. 1994); <u>Maryland Disability Law Center, Inc. v. Mount Washington Pediatric Hospital, Inc.</u>, 106 Md. App. 55, 664 A. 2d 16 (Md. Ct. of Special App. 1995).

In <u>Cotten</u>, 198 WL 224953, the court ruled (under the Developmental Disability Act) that states have an affirmative duty to implement policies and practices which promote effective investigative access by P&As. The court described this obligation as follows:

> [The DD Act] gives to the institutionalized developmentally disabled the right to an effective protection and advocacy system. . . . The Act not only describes the range of services to be provided by the protection and advocacy systems, it also states that the systems "must have the authority" to perform these services. <u>The state cannot satisfy the requirements of the [DD Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority.</u>

1989 WL 224953, at *9 (emphasis added). See footnote 2, <u>supra</u> explaining the application of interpretations of the DD Act to the PAIMI Act.

### A. Plaintiff Has the Right to Access the Records of Individual Consumers regarding their Care and Treatment.

Crucial to its investigative responsibilities is the P&A's full right to have access to <u>all records</u> of individuals with mental illness. The PAIMI Act provides clear authority for access to the records sought here at 42 U.S.C. § 10805(a)(4) (B). That provision mandates access to records of individuals with mental illness where, as here, the individual has authorized the release. 42 C.F.R. § 51.41(b)(1). ULS-P&A has provided authorizations to Northwestern and

to DMH for the release of certain individuals' records, but has not received the requested documents.[9] This Court should order the immediate release of these documents.

In addition, individual authorization is not required in certain instances. Where the P&A has probable cause to believe an individual has been subject to abuse and/or neglect and the person cannot authorize the P&A to access his or her records because he or she lacks capacity to consent or is unavailable, and either (1) does not have a guardian or (2) the state or a public agency is the individual's guardian, the P&A shall have access to the individual's records. In full, this provision states that the P&A shall have access to "all records" of any individual (including an individual who has died or whose whereabouts are unknown)--

> (i) who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;
>
> (ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and
>
> (iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect[.]

42 U.S.C. § 10805(a)(4)(B); 42 CFR § 51.41(a) and (b).

Therefore, Defendants must release the records of the consumers whose records are sought, but, who, due to mental impairment, are unable to authorize access and have no guardian or the "State" serves as their guardian.[10] The Court should order Defendants to release

---

[9]Northwestern permitted ULS-P&A to review some of the records of four consumers but has not yet provided access to all financial records requested.

[10]In determining whether a consumer has a legal guardian in this context, the relevant authority is contained in the regulations implementing the PAIMI Act at 42 C.F.R. § 51.2. The regulations there define a "legal guardian" as:

26

the documents requested immediately.

The Defendants have acknowledged that ULS-P&A has authority to access records if there is probable cause to suspect abuse or neglect. See Exhibit 7, Letter from Knisley to Thorner of 4/14/04. The regulations implementing the PAIMI Act and its case law make clear that the P&A has very broad discretion in determining whether there is probable cause justifying access to records needed to investigate. The relevant regulation, 42 C.F.R. § 51.2, defines "probable cause" as "reasonable grounds for belief" that one has been or may be subject to abuse or neglect. "The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect." Id.

All cases addressing the issue have determined that the P&A is the "final arbiter" of the probable cause determination. E.g., Office of Protection and Advocacy for Persons with Disabilities v. Armstrong, 266 F. Supp. 2d 303 (D. Conn. 2003); The Legal Center for People with Disabilities v. Earnest, 188 F.Supp. 2d 1251, 1257 (D. Co. 2002), rev'd on other grounds, 320 F.3d 1107 (10th Cir. 2003); Advocacy, Inc. v. Tarrant County Hospital District, 2001 WL 1297688 (N.D. Tx. October 11, 2001); Iowa Protection and Advocacy Services, Inc. v. Gerard

---

an individual whose appointment is made and regularly reviewed by a State court or agency empowered under State law to appoint and review such officers, and having authority to consent to health/mental health care or treatment of an individual with mental illness. It does not include persons acting only as a representative payee, persons acting only to handle financial payments, attorneys or persons acting on behalf of an individual with mental illness only in individual legal matters, or officials responsible for the provision of health or mental health services to an individual with mental illness, or their designees.