**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNIVERSITY LEGAL SERVICES-**
  **PROTECTION AND ADVOCACY, INC.**

                                        **CIV.  NO: 1:04cv01021 (RBW)**
                                        **Judge Walton**


                              **Plaintiffs,**

**v.**


  **NORTHWESTERN HUMAN SERVICES,**


              **and**


**MARTHA B. KNISLEY, DIRECTOR,**
  **DISTRICT OF COLUMBIA DEPARTMENT OF**
  **MENTAL HEALTH,**
        **in her official capacity,**
                              **Defendants.**


**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1,

Plaintiff University Legal Services, Inc. - Protection and Advocacy ("ULS") submits this

Memorandum of Points and Authorities in support of Plaintiff's Motion for Summary Judgment.

As the protection and advocacy program for the District of Columbia, ULS has certain access

rights provided by Federal law.  Defendants, Northwestern Human Services ("Northwestern")

and Martha B. Knisley, in her official capacity as Director, District of Columbia Department of

Mental Health ("DMH"), have denied ULS timely access to requested records in violation of the

Protection and Advocacy for Individuals with Mental Illness ("PAIMI") statute, 42 U.S.C.

§§10801-10827, the First and Fifth Amendments of the U.S. Constitution, and 42 U.S.C. §1983.

ULS filed a Motion for Preliminary Injunction asking this Court to order the Defendants to provide the requested records.  Specifically, ULS asked for the identities and contact information of individuals with mental illness (and for their guardians, if any) who received services from Northwestern from May 2002, to the present, for whom (a) staff at Northwestern or Northwestern itself acted as representative payee for Federal Social Security benefits or for whom (b) Northwestern held funds or had authority over some or all of their funds; (2) any and all DMH investigation reports concerning allegations of financial mismanagement by Northwestern, and related documents produced during the investigation; and (3) numerous individuals' records requested pursuant to each individuals' authorization or for whom authorization is not required under the PAIMI statute.

In July 2004, ULS and DMH settled the Preliminary Injunction.  Pursuant to a extremely restricted authorization which was facilitated by appointing ULS as a limited client representative solely for the purpose of authorizing release, DMH gave ULS a list of names and contact information for those it had identified as individuals for whom Northwestern had acted as representative payee or for whom Northwestern had handled funds.   Subsequently,  DMH and Northwestern have provided ULS with numerous documents requested pursuant to individual authorizations.  Nevertheless, Defendants have failed to provide ULS with numerous documents, most documents were only produced in response to this litigation, and DMH will certainly refuse to provide similar requested information in the future.

For the reasons set forth in this Memorandum of Points and Authorities, ULS respectfully request this Court to enter Declaratory Judgment that ULS has a Federal right of access to the requested records and a Permanent Injunction ordering Defendants to provide ULS with access

to requested records not yet produced and to provide access in the future as required by Federal law.  Further, this Court should award ULS costs, expenses, and reasonable attorneys' fees.

**<u>Introduction</u>**

Plaintiff is the Protection and Advocacy agency in the District of Columbia, which has statutory authority to investigate incidents of abuse and neglect involving individuals with mental illness.  The Department of Mental Health oversees all agencies providing mental health services within the District.  Northwestern Human Services was a mental health service provider contracting with the District and certified by the District to provide mental health services for whom Plaintiff has probable cause to believe abused or neglected its consumers.

In March 2004, Plaintiff requested records and information pertaining to consumers' names and addresses as part of the Plaintiff's statutory authority.[1]  Defendants refused to provide ULS with the requested records, including a refusal to provide names and contact information of the consumers that ULS had probable cause to believe had been subject to abuse or neglect by Northwestern.  <u>See</u> Exhibits 6, 7, and 10 of Motion for Preliminary Injunction.   Pursuant to the PAIMI statute, 42 U.S.C. §§10801-10827, ULS has a right to the records requested.  Moreover, ULS has a First Amendment right to consult with the population it was created to serve.

Although Northwestern and DMH have provided ULS with numerous documents

---

[1]ULS sent an original request to DMH and Northwestern on March 23, 2004, Exhibits 4 and 5 of the Plaintiff's Memorandum in Support of Motion for Preliminary Injunction ("Motion for Preliminary Injunction").  Later, after DMH and Northwestern refused to provide access to the requested records, ULS amended its request and provided a detailed listing of requested records in a letter to Northwestern dated May 4, 2004, Exhibit 8 of the Motion for Preliminary Injunction and a letter to DMH dated May 14, 2004, Exhibit 10 of Motion for Preliminary Injunction.

pursuant to authorizations, they have continued to deny ULS access to certain requested records.

Moreover, both parties only gave ULS most records as a response to this litigation. Neither

DMH nor Northwestern have provided ULS with the names of any of the legal guardians of the

consumers who have them.

Because DMH contends that it is a violation of the D.C. Mental Health Information Act,

D.C. Law 7-1201.02, to provide names and contact information to ULS, DMH is certain to

violate the PAIMI Act and the First and Fifth Amendments in the future.[2] Therefore, this Court

must enter a Declaratory Judgment that ULS has a Federal right of access to the names and

contact information of individuals for whom ULS has probable cause to believe have been

subject to abuse and neglect as well as all other records requested as required by Federal law.

Moveover, because DMH is highly likely to refuse access to such records in the future and

Northwestern continues to deny ULS access to many requested records, this Court must enter a

Permanent Injunction ordering Defendants to provide ULS with access to records as required by

Federal law.

## Statement of Undisputed Material Facts

Northwestern had been certified by the DMH as an Assertive Community Treatment

("ACT") team. See Defendant Martha B. Knisley's, Director, District of Columbia Department

of Mental Health, Answer to Complaint ("DMH Answer") at para. 18. As an ACT team,

Northwestern was certified to provide mental health services to consumers with mental illness

living in the District of Columbia. DMH is responsible for regulating all mental health services

---

[2]As recently as November 17, 2004, DMH repeated its position that the D.C. law prohibits DMH from releasing names of individuals. ULS' most recent request was related to patients at Saint Elizabeths Hospital.

and mental health supports in the District of Columbia and is responsible for assessing and
meeting the service needs of consumers of mental health services.  *Id.* at para. 9.

University Legal Services, Inc. has been designated by the Mayor as the Protection and
Advocacy ("P&A") agency for the District of Columbia pursuant to 42 U.S.C. §10801 *et seq.*
See DMH Answer at para. 6.  As the P&A, Plaintiff has the authority to investigate incidents of
abuse and neglect and receive access to records of consumers for whom it has probable cause to
believe have been subjected to abuse or neglect.  *Id.* at para. 14.

On or about March 25, 2003, ULS wrote to DMH to ask it to investigate Northwestern
for certification violations relating to one of its clients.  *Id.* at Para. 17.  See also Exhibit 2 of
Motion for Preliminary Injunction.  Later ULS learned that DMH was investigating
Northwestern for financial mismanagement and had produced a report.  ULS requested the report
and other documents related to the investigation.  Plaintiff also requested the names and contact
information for the individuals for whom Northwestern had handled money. See DMH Answer,
para 19, 20, 21; see also Exhibits 2, 4, 9, 10, 14, and 15 of Motion for Preliminary Injunction.
Plaintiff also learned of an investigation of Northwestern by the Federal Bureau of Investigation
and the District of Columbia's Office of Inspector General.  See DMH Answer, para 19; see also
Exhibit 18 of Motion for Preliminary Injunction.  Despite the fact that Plaintiff asked for a copy
of this report in March 2004, Plaintiff did not receive a copy until the eve of filing the Complaint
in this case in June 2004.  See DMH Answer, para 35.

The DMH report stated that Dr. Gleason, a former psychiatrist at Northwestern, alleged
that Northwestern:

> lacks documentation for expenditures from consumer accounts
> where [Northwestern] is the representative payee, has not

> accounted for missing consumer funds and has little or no
> documentation of what services [Northwestern] has provided to
> some consumers. . .. [Northwestern] held large sums of funds for
> whom Northwestern serves as representative payee,
> [Northwestern] was not providing appropriate services . . ..

<u>See</u> Exhibit 18 of Motion for Preliminary Injunction at p. 1, 2.  Dr. Gleason had also alleged that

some consumers were homeless despite the fact that Northwestern was paying housing costs for

them.  *Id* at 2.  Further, he alleged that Northwestern staff had personal relationships with

landlords and housing operators for whom consumers were renting, and these housing providers

were being paid exorbitant rent for substandard housing.  *Id.;* <u>see also</u> DMH Answer, para. 37.

The DMH report stated that DMH was substantiating many of the allegations of Dr.

Gleason, which outlined the financial abuse of consumers where over $100,000 of consumer

funds were unaccounted for.  <u>See</u> Exhibit 18 of Motion for Preliminary Injunction at p. 4; <u>see</u>

<u>also</u> DMH Answer, para. 36.

Based on this report and other information that it had acquired, ULS had probable cause

to believe Northwestern had abused or neglected individuals with mental illness. Despite making

numerous requests to both Northwestern and DMH prior to filing, the Defendants did not

provide the requested records to ULS, except as described above.[3]  On June 21, 2004, Plaintiff

filed this suit against Northwestern and DMH because of their failure to timely produce the

requested records.

**I.     ULS Is Entitled to Summary Judgment as a Matter of Law.**

In reviewing a motion for summary judgment, the Court must first determine if there are

---

[3]Northwestern permitted ULS to review some records of four clients for whom ULS had
provided authorization.

genuine issues of material fact.  *Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1465 (D.C. Cir. 1990)

(citing Fed.R.Civ.P. 56(c)).  Summary judgment should be granted where the moving party has

shown that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986).

All the issue remaining to be resolved in this case are legal questions for the Court.  Once

Plaintiff has determined that it has probable cause to believe individuals with mental illness have

been subjected to abuse or neglect, the Defendants must release certain records.  Defendants'

bases for refusal turn on questions of law.  There are no questions of material fact.   Thus, this

Court must resolve the issues of law and order the Defendants to release the requested records.

See  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S.

317 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp*, 475 U.S. 574 (1986)

**II.**    **The PAIMI Statute Provides P&A's with Access Needed to Protect a Vulnerable
Population.**

Congress has outlined that every state should establish an agency which will be the

"Protection and Advocacy" system (P&A).  See 42 U.S.C. § 10801 *et seq.*  The P&A has

authority to both: 1) pursue "administrative, legal, and other appropriate remedies to ensure the

protections of **individuals with mental illness** . . .," 42 U.S.C. § 10805(a)(1)(B), and 2)

investigate "incidents of abuse and neglect of **individuals with mental illness** if the P&A has

probable cause to believe that the incidents occurred, 42 U.S.C. § 10805(a)(1)(A) (emphasis

added).  Congress has acknowledged within the body of the statutes that individuals with mental

illness are a vulnerable population and are entitled to protection.  42 U.S.C. § 10801(a)(1).  The

statute clearly states that a function of the P&A is to "investigate incidents of abuse and neglect

of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe the incidents occurred." 42 U.S.C. §10801(b)(2)(B).

Congress specifically granted the P&A access to all facilities within the state that provide care or treatment. 42 U.S.C. §10805(a)(3). In addition, Congress has stated that the P&A will have access to **all** records of individuals with mental illness 1) who have authorized access to such records or 2) for whom the P&A has probable cause to suspect are being abused or neglected and who are unable to give authorization, including those who have died or whose whereabouts are unknown, and who do not have a guardian or conservator or whose representative is the state. 42 U.S.C. §10805(a)(4)(B) (emphasis added).

Access to records is critical to a P&A's investigative authority. Given the importance of the P&A in protecting such a vulnerable and ignored population, Courts have refused to narrowly define terms in the PAIMI statute and, instead, have given P&As broad authority to investigate as intended by Congress. See *Office of Protection and Advocacy v. Armstrong*, 266 F. Supp. 2d 303, 316 (D. Conn. 2003) ("[O]n a policy basis, such a restriction [on the definition of facility] would unreasonably limit the purposefully broad access given to P&As in [PAIMI] to redress the suffering of mentally ill individuals"); *Iowa Protection and Advocacy Services v. Gerard Treatment Programs*, 152 F. Supp. 2d 1150, 1165 (N.D. Iowa 2001) ("[S]uch a reading of the statute [allowing access to records even when the guardian refuses to authorize release] is in keeping with the 'object and policy of he PAMII Act") (citations omitted). Thus, P&As have been granted expansive access to records and facilities to enable them to fulfill their mandate to protect and advocate for individuals with mental illness.

**A.      Northwestern Consumers were "Individuals with Mental Illness" and Within ULS'
Mandate to Protect.**

A P&A has authority to investigate and advocate under the PAIMI Act on behalf
"individuals with mental illness."  It cannot be questioned that the consumers involved in this
case are in need of mental health services.  The individuals who should have been receiving care
at Northwestern were intended to receive services from an "ACT" team.  Anyone who is in need
of ACT services has a severe and persistent mental illness such as schizophrenia, psychotic
disorders, and bipolar disorder, with a history of hospitalization, substance abuse, criminal
justice involvement or other indication of high service needs and as a result of their mental
illness have significant difficulty performing daily living and employment tasks.  See Plaintiff's
Complaint, para. 39; see also DMH Answer, para 42.  ACT services are required by regulations
to be intensive, integrated treatment for consumers with serious and persistent mental illness.  22
DCMR 3422.1.  Northwestern consumers were clearly in need of mental health services.

**1.      P&As Have Authority to Investigate Incidents of Abuse and Neglect
of Individuals Living in the Community.**

The PAIMI statute defines an "individual with mental illness" as a person who has "a
significant mental illness or emotional impairment" and 1) is an inpatient or resident in a facility,
2) in the process of being admitted to a facility, or 3) lives in a community setting, "including
their own home."  42 U.S.C. §10802(4).[4]  This third prong "community setting" was added by

─────────────────────

[4]In full the statute states:

The term "individual with mental illness" means, except as provided in section 10804(d) of this
title, an individual --

(A)who has a significant mental illness or emotional impairment, as determined by a mental
health professional qualified under the laws and regulations of the State; and

The Children's Health Act of 2000, Public Law 106-310, 114 Stat. 1101 (October 17, 2000); Congress expanded the definition of individuals with mental illness, and in doing so, gave the P&A agencies much broader authority to advocate for people with mental illness.  When Congress passed this expansion to the Act, it recognized that, through advances in medicine and technology, more people with mental illness were moving from institutions into community settings, and protection of these individuals was critical.  See Senate Report 196, 106th Cong. 1st Session 25-26 (1999).

　　　The P&A is to investigate  "incidents of abuse and neglect."   42 U.S.C. § 10805(a)(1). The definitions of abuse and neglect state that the abuse or neglect must involve an individual who is either an "employee of" or "providing services" in a "facility."  42 U.S.C. § 10802 (1) and (5).[5]   To ensure the protections clearly required by the statute, "facility" is broadly defined

―――――――――――――――――――――

(B)(i)(I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown;
(II) who is in the process of being admitted to a facility rendering care or treatment, including persons being transported to such a facility; or
(III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or

(ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home.

42 U.S.C. §10802(4).

　　　[5]The PAIMI Act defines abuse as "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly or intentionally, and which caused, or may have caused, injury or death to an individual with mental illness." 42 U.S.C. § 10802(1).

Neglect is defined in 42 U.S.C. § 10802 (5) as:

　　　a negligent act or omission by any individual responsible for providing services in a
　　　facility rendering care or treatment which caused or may have caused injury or death

Page 10

and its definition cannot be narrowed so as to prevent the P&A from fulfilling its statutory

mandate to protect the vulnerable.

If the definition of "facility" is limited to institutions or buildings where individuals

reside, as argued in Northwestern's Motion to Dismiss and DMH's Supplemental Memorandum

of Law in Opposition to Preliminary Injunction, then the 2000 amendment is narrowed

significantly and ULS cannot fulfill the mandate of the PAIMI act to "investigate incidents of

abuse and neglect of individuals with mental illness."  42 U.S.C. § 10805(a)(1)(A).  The

definition of "individual with mental illness" specifically includes those living in "their own

home."  42 U.S.C. § 10802(4)(B)(ii).  The statute specifically authorizes P&As to investigate

incidents of abuse and neglect of "individuals with mental illness."  Because the definitions of

abuse and neglect are tied to the definition of facility, facility cannot be defined so that it

eviscerates the 2000 amendment.[6]

The PAIMI statute states: "a facility may include, **but need not be limited to**, hospitals,

nursing homes, community facilities for individuals with mental illness, board and care homes,

homeless shelters, jails and prisons."  42 U.S.C. §10802(3) (emphasis added).  Thus, the

_____

to a individual with mental illness or which placed a individual with mental illness at
risk of injury or death, and includes an act or omission such as the failure to establish
or carry out an appropriate individual program plan or treatment plan for a individual
with mental illness, the failure to provide adequate nutrition, clothing, or health care
to a individual with mental illness, or the failure to provide a safe environment for a
individual with mental illness, including the failure to maintain adequate numbers of
appropriately trained staff.

[6]The Senate Report on the original bill in which the 2000 Amendments were first
introduced specifically stated that the 2000 Amendment expanded the P&As authority to
protecting individuals "living in communities and who may be subject to abuse or neglect . . .."
Senate Report 196, 106th Cong. 1st Sess. at 25.

definition of facility is expansive.  See *Wisconsin Coalition for Advocacy v. Czaplewski,* 131 F.

Supp. 2d 1039, 1050 (E.D. Wis. 2001) (emphasis in original) ("Congress fully intended *any*

facility, whether it be publicly or privately owned to be subject to the provisions of [PAIMI]");

*Iowa Protection and Advocacy Services v. Rasmussen*, 206 F.R.D. 630, 637 (S.D. Iowa 2001)

(the words "but not be limited to" in the regulations prescribing the P&A's access to records "in

no way intends to limit what a protection and advocacy system is entitled to under the statute");

*Kansas Advocacy and Protective Services v. Stormont-Vail Healthcare*, Case No. 00-4135-RDR

at 10 (D. Kan. Sept. 25, 2002) ("limiting disclosure to the records of persons who "reside" in a

treatment facility appears contrary to the goals of protecting the welfare of the mentally ill

persons and complying with the conditions of federal law") attached hereto as Exhibit A.

The common definition of "facility" is "something built, installed, or established for a

particular purpose." Webster's New Collegiate Dictionary at 410.  Nothing in this commonly

accepted definition limits facility to a place where individuals reside.

By examining the legislative history, it is clear that Congress intended the P&A to

address abuse and neglect issues for people who reside in community settings.  For instance, the

Senate Report says:

> When the appropriation for the program reaches
> $30,000,000, this section also expands the authority of the
> [P&A] system to include protecting and advocating on
> behalf of the rights of individuals with a serious mental
> illness or emotional impairment who are living in
> communities and who may be subject to abuse or neglect
> or discrimination in housing, health care, employment or
> benefits.

Senate Report 196, 106th Cong. 1st Session 25-26 (1999).[7]  They further explain that:

> Over the past twenty years tremendous advances in treatment
> services for mental illness have allowed persons with mental
> illness to receive needed treatment in the community.
> Unfortunately, there has not been a mechanism to ensure that they
> are receiving the care and advocacy services they need.

*Id*. p. 26.

Nevertheless, the program regulation defining "facility" does limit the meaning to a

"public or private residential setting . . .."  42 C.F.R. § 51.2.  This regulation, however, was

promulgated in 1997 and has been superseded by the 2000 amendment.   As written, it conflicts

with the intent of Congress to expand the P&A authority to those in the community, including

those living in their own homes.   Therefore, the narrow definition of facility within the

regulations cannot stand.  The definition of facility must include community facilities such as

Northwestern.

As the P&A, ULS has the right to advocate and protect individuals receiving services in

community settings who are being subject to abuse and neglect.  Because Northwestern was a

facility providing care and treatment and because ULS has probable cause to believe that the

consumers of Northwestern were being subject to abuse and neglect, ULS has the right to gain

access to the records requested.

### 2.        Financial Mismanagement Constitutes Abuse or Neglect.

ULS has authority to investigate incidents of abuse and neglect if there is probable cause

to believe that the incidents occurred.  42 U.S.C. 10805(a)(1)(A).  Egregious financial

---

[7] The P&A was allotted approximately $33,000,000 for 2002, 2003 and 2004
respectively.  (See the Catalog of Federal Domestic Assistance, §93.138).

mismanagement constitutes abuse and/or neglect where such mismanagement impacts the conditions of the lives of the individuals with mental illness.  These are not wealthy individuals who have a complaint against a financial planner.  By definition, those receiving Supplemental Social Security are living on a meager income.  Defendants cannot deny that most of the individuals who were served by Northwestern struggled to meet their most basic needs and certainly had little or no money for anything beyond food and shelter.  Some were homeless.  For these individuals, mismanagement of funds resulted in abuse and neglect because it directly injured the individuals.

The PAIMI statute defines abuse and neglect as something that causes injury to the consumer.  The regulations more specifically define abuse to include: "any other practice which is likely to cause immediate physical or psychological harm or result in long-term harm if such practices continue.  42 C.F.R. § 51.2.   Neglect includes failure to provide adequate nutrition, clothing, or health care.  42 U.S.C. § 10802(5) and 42 C.F.R. § 51.2.[8]

Financial exploitation of poor and vulnerable consumers carries with it a real threat of physical injury as well as psychological injury.  Certainly, many consumers denied their basic monetary benefits are unable to obtain adequate nutrition, health care, clothing and shelter.

Significantly, the D.C. Mental Health Consumers' Rights Protection Act states explicitly that for people with mental illness, financial wrongdoing constitutes abuse.  Specifically, it defines abuse as, "any knowing, reckless, or intentional act or omission by a provider that causes or is likely to cause or contribute to, injury, death, or *financial exploitation* of a consumer."  D.C. Code 7-1231.02 (2001).  Because the P&A's authority to investigate is expansive, see *supra* at

---

[8]See *supra* n. 5.

11, the definition of abuse and neglect should not be limited to physical harm but should be defined broadly so that the P&A can protect this vulnerable population.

Additionally, the Plaintiff does not need to rely solely on financial abuses in order to establish probable cause. The Plaintiff has knowledge of many other incidents that constitute abuse and neglect. As stated in the Plaintiff's Complaint, several clients, for whom Northwestern was supposedly providing services, were homeless, "dirty, disheveled and eating out of garbage cans." Plaintiff's Complaint, p. 5, para. 14. The report submitted by DMH also explains that there were concerns that some of the consumers for whom Northwestern was paying for housing, were either homeless or living in substandard housing. This evidence of a "failure to provide a safe environment," 42 U.S.C. §10802(1), constitutes probable cause to believe Northwestern staff neglected individuals with mental illness.[9]

The truth of these facts is not the relevant question; instead, the P&A asks whether such allegations constitute probable cause to believe abuse or neglect has occurred. The P&A need not prove the abuse or neglect to access the records; such a standard would defeat the purpose of the investigation – which is to determine whether there was, in fact, abuse or neglect.

### 3. The P&A Determines Whether Probable Cause Exits.

The P&A makes the determination of whether or not probable cause exits. See *Office of Protection and Advocacy for Persons with Disabilities v. Armstrong*, 266 F.Supp. 2d 303 (D. Conn. 2003); *The Legal Center for People with Disabilities v. Earnest*, 188 F.Supp. 2d. 1251,

---

[9]If the Court finds that financial mismanagement or the evidence alleged does not constitute abuse or neglect, ULS asks leave to amend its complaint to allege new facts as a basis for probable cause, facts which ULS has discovered after reviewing records Defendants have released since the Complaint was filed.

1257 (D. Co. 2002), <u>rev'd on other grounds</u>, 320 F.3d 1107 (10th Cir. 2003); *Advocacy, Inc. v. Tarrant County Hospital District,* 2001 WL 1297688 (N.D. Tex. October 11, 2001); *Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs,* 152 F.Supp. 2d 1150, 1172 n.1 (N.D. Iowa 2001); *Arizona Center for Disability Law v. Allen,* 197 F.R.D. 689 (D. Ariz. 2000); *Maryland Disability Law Center v. Mount Washington Pediatric Hospital*, 664 A. 2d. 16 (Md. App. 1995).

Clearly, Plaintiff had probable cause to believe that the consumers of Northwestern were being abused and/or neglected at the hands of the Northwestern staff.  DMH's report, the knowledge and confirmation of active investigations by the Federal Bureau of Investigation and the D.C. Office of Inspector General, and prior experience with clients all provided Plaintiff with probable cause to believe that Northwestern consumer's were being abused or neglected.   Far less evidence than this would constitute probable cause.

Nevertheless, it cannot be that the P&A must prove that it has probable cause before it can proceed with an investigation.  "[A] P&A is the final arbiter of probable cause for purposes of triggering its authority to access all records for an individual that may have been subject to abuse or neglect.  To conclude otherwise would frustrate the purpose of the P&A laws to establish an effective system to protect and advocate for the rights of individuals with disabilities." *Allen,* 197 F.R.D. at 693.  ULS clearly had probable cause to believe that the staff of Northwestern, through their actions and their failure to act, injured the consumers, and the P&A's own assessment of that should not be questioned.

### B.        Plaintiff is Entitled to Timely Access to Records.

Crucial to its investigative responsibilities is the P&A's full right to have access to <u>all</u>

records of individuals with mental illness.  The PAIMI Act, 42 U.S.C. § 10805(a)(4) (B), provides clear authority for access to the records sought here.  That provision mandates prompt access to records of individuals with mental illness and its scope is expansive.  Federal regulations more specifically define records.  42 C.F.R. § 51.41.  The records include those related to the individual "whether written or in another medium, draft or final, including handwritten notes, electronic files, photographs or video or audio tape records."  Moreover, the records include any "obtained in the course of providing intake, assessment, evaluation, supportive and other services, including medical records, financial records, and reports prepared or received by a member of the staff of a facility or program rendering care or treatment."  42 C.F.R. § 51.41 (c).

Although Defendants have released many records to ULS, most were released following initiation of this litigation.   Moreover, DMH and Northwestern have never provided certain documents requested.[10]   This Court must enter a declaratory judgment requiring timely release of requested records and a preliminary injunction ordering the immediate release of documents

---

[10]For example, ULS asked for all correspondence to and from Dr. Gleason, former psychiatrist at Northwest related to: 1) Northwest's consumers and its provision of services and 2) Northwest's billing of DMH, the core service agency, medicaid, or any other agency or entity on behalf of consumers of Northwest for services provided to the consumer, 3) Northwest's billing of consumers for any services provided to consumers and any issues concerning handling of consumer's money; and 4) any other billing practices.  ULS also requested, among other things, the names of any and all Northwestern staff who accounted for or handled any D.C. consumer's money or acted as a representative payee for any D.C. consumer.  See Exhibit 8 of Motion for Preliminary Injunction.  Northwestern has not provided ULS with these documents. DMH has not provided records requested of the Public Core, the public ACT team that is now providing services to many former Northwestern consumers.

Page 17

not yet provided and future timely release of all records required to be released by Federal law.[11]

> **C.     Plaintiff is Entitled to the Names and Addresses of the Individuals Whose Money Was Handled by Northwestern.**

As a matter of law, Plaintiff is entitled to the names and contact information of individuals with mental illness who it believes may have been subject to abuse and neglect.  A P&A's ability to investigate incidents of abuse and neglect or to advocate and protect the rights of individuals with mental illness, as prescribed by 42 U.S.C. § 10801(b)(2), is severely impeded and, in some instances, impossible to achieve without access to the names and contact information of individuals.  The ability to deny the P&A access to this information acts not only as a barrier to an effective investigation, it can be the door slammed shut on access to any records.[12]

A P&A system that is denied access to records because it cannot access individuals is an ineffective P&A system -- in violation of Federal law.  As expressed in *The Advocacy Center v. Stadler*, 128 F. Supp. 358, 367 (M.D. La 1999) (citations omitted), "The [PAIMI] Act requires 'an "effective" system of advocacy.'  The authority to investigate would mean nothing and

---

[11]Although the regulations require the release of reports prepared by an agency charged with investigation of abuse, neglect, or injury occurring at a facility rendering care or treatment . . .." 42 C.F.R. § 51.41(c)(2), DMH refused to release its report on Northwestern until after ULS informed DMH that it was filing this litigation.  <u>See</u> Motion for Preliminary Injunction at 14.

[12]A P&A's need to know the identity of individuals that may have been subjected to abuse or neglect is not just relevant to this instance where the consumers live in the community and identifying them is very difficult, if not impossible.  Even in a residential setting, the name of the individual is critical to an effective investigation.  For example, the P&A might receive a report from a staff member that an individual in a facility has been sexually assaulted or the P&A might receive an unusual incident report describing an abusive use of restraints but the name has been redacted.  If the facility can refuse to provide the name of the individual involved, it is almost impossible for ULS to investigate the incident.

advocacy in the form of investigation would be ineffective if federal law would not preempt the Department's policy."  Thus, where state law or policy renders the P&A ineffective, it must be preempted.  See also, *Mississippi Protection & Advocacy System v. Cotten*, 929 F.2d 1054, 1059 (5th Cir. 1991) ("The state cannot satisfy the requirements of the [Developmental Disabilities Act] by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority.")

The Mental Health Information Act of the District of Columbia specifically prohibits a mental health provider from disclosing an individual's identity.  D.C. Law 7-1201.02; 701201.01(9) ("'Mental health information' means any written, recorded or oral information acquired by a mental health professional in attending a client in a professional capacity which: (A) indicates the identity of a client . . ..")  The Defendants have claimed that this law prohibits them from disclosing the individuals' names and contact information, even though failure to do so prevents the P&A from investigating as required by the PAIMI Act.  If the law does so prohibit, it is preempted by the PAIMI statute.

Courts have not hesitated to preempt state law where such law has prevented the P&A from fulfilling its Federal mandate.  *Center for Legal Advocacy v. Hammons,* 323 F.3d 1262 (10th Cir. 2003) (PAIMI preempts state law that prohibited release of peer review materials); *Pennsylvania Protection and Advocacy, Inc. v. Houstoun,* 228 F.3d 423 (3rd Cir. 2000) (PAIMI preempts state law protecting peer review reports); *Mississippi Protection and Advocacy System, Inc. v. Cotton*, 1989 WL 224953 (S.D. Miss. 1989), *aff'd*, 929 F.2d 1054 (5th Cir. 1991) (preempting law that prevented P&A from acting effectively); *Iowa Protection and Advocacy Services v. Rasmussen,* 206 F.R.D. 630 (S.D. Iowa 2001) (preempting state law that prohibited

Page 19

disclosure); *Iowa Protection and Advocacy Services v. Gerard*, 152 F. Supp. 2d 1150 (N.D. Iowa 2001) (preempting state law that allowed guardians to deny access to P&A)*; The Advocacy Center v. Stalder*, 128 F. Supp. 2d 358 (M.D. La. 1999) (preempting law requiring *in camera* review.)

As expressed in *Wisconsin Coalition for Advocacy v. Czaplewski*, 131 F. Supp. 2d 1039, 1051 (E.D. Wis. 2001), "defendants' refusal to provide it with records that it is entitled to review (indeed, charged to review as a part of its responsibilities) does, in a very real and readily identifiable way, pose a threat to the plaintiff's being able to discharge its obligations.  In *Czaplewski,* the court preempted state law and found that the P&A was irreparably harmed when the agency refused to give the P&A access to necessary records because the P&A would lose access to possible clients and possible claims might be lost.  Similarly, the D.C. Mental Health Information Act must be preempted to the extent it prevents the P&A from effectively investigating incidents of abuse and neglect or advocating for individuals with mental illness.

A P&As right to names and contact information has been upheld by several Courts.  In a case very similar to this one, the court upheld the P&A's authority to receive names of consumers of a facility in which there was suspected abuse and neglect.  In *Georgia Advocacy Office v. Borison*, 238 Ga. App. 780, 520 S.E. 2d 701 (Ga. App. 1999), the facility was required to give the names and contact information of persons for whom the P&A had probable cause to believe had been abused/neglected but could not identify.  The P&A had begun an investigation to determine whether persons with disabilities who were the patients of a certain doctor were the victims of abuse and neglect.  The P&A had no way to identify those persons, nor did it know if the individuals had disabilities.

The Court held that the Defendant was required to give information about the individuals and their contact information.  Recognizing that the P&A must have access to this information, and "to hold otherwise would unnecessarily insulate potentially culpable Defendants from accountability for their purported misdeeds."  *Id* at 784-785.

> Armed with a showing of "probable cause" as defined by federal law, [the P&A] then contacted [the Defendant] to obtain additional facts.  But at that juncture [the P&A's] efforts became stymied.  Although [the P&A] presented probable cause suggesting that numerous persons may have been victimized, it could not identify them by name.  Nor could [the P&A] initiate contact with unidentified person.  Without access to the records, [the P&A] . . . essentially [was] unable to provide their consent.

238 Ga. App. At 783.  In *Borison*, the Court directed the trial court to "devise a plan for ensuring an expeditious and confidential review . . . to determine which, if any, [patients] . . . were subject to abuse or neglect . . .."

A similar ruling was reach in *Cramer v. Chiles,* No. 98-43-MISC-26 (M.D. Fla. Sept. 1, 1998), Exhibit 20 to Motion for Preliminary Injunction.  The court ordered the Defendant to provide the P&A access to the names of consumers, in addition to the identity of guardians in accordance with the Developmental Disabilities Act and its implementing regulations at 45 C.F.R. § 1386.22(I), which is substantially identical to the analogous PAIMI Act regulations.

Most recently, the Eastern District of Virginia upheld the Virginia P&A's authority to receive names and contact information.  The P&A sought names and contact information of persons with mental illness in State-operated facilities who the State determined were "ready for discharge."  The court ordered the release.  *Virginia Office for Protection and Advocacy v. Reinhard* (E.D. Va. Feb. 19, 2004) attached hereto as Exhibit B.

In *Pennsylvania Protection & Advocacy v. Royer-Greaves*, 1999 WL 179797 (E.D. Pa

Page 21

1999), the court recognized that a P&A needs access to the names and contact information of guardians even before it has probable cause so that it can make further inquiries to determine if probable cause exits.  "The [P&A's] mandate is to be the advocate for all individuals with developmental disabilities, not just those who become their clients."  1999 WL 179797 at 11. Similarly, here, the P&A cannot advocate on behalf of individuals that it cannot identify and cannot determine whether there may be probable cause without access to names and contact information of individuals and their guardians.

Like the "large gap not affirmatively addressed by the Act but so obvious that it most certainly was contemplated by its drafters" filled by the Court in *Royer-Greaves,* 1999 WL 179797 at 10, this Court must fill the gap which too must have been assumed, that P&As have access to the names and contact information of individuals where abuse or neglect is suspected so that it can obtain an individual's authorization to review records or obtain records where authorization is not required by the PAIMI law.[13]

Confidentiality concerns should not prevent release.  PAIMI requires the P&A to "maintain the confidentiality of patient records to the same extent as is required of the provider." 42 U.S.C. § 10806(a).  "Several district courts have concluded that the issue of confidentiality should not act as a bar to disclosure to a protection and advocacy system."  *Rasmussen* 206 F.R.D. at 635 (S.D. Iowa 2001) citing *Gerard Treatment Programs,*  152 F. Supp. 2d at 1174-75;

---

[13]The regulations clearly spell out that if a P&A's access to records is denied, the P&A shall promptly be provided with the name, address, and telephone number of the legal guardian, conservator, or other legal representative of an individual with mental illness.  42 C.F.R. § 51.43. Receipt of the names of a representative without also receiving the name of the individual with mental illness would certainly be confusing, if not meaningless.  Thus far, the Defendants have provided ULS with no information about guardians, conservators, or other legal representatives.

*The Advocacy Center v. Stalder*, 128 F. Supp. 2d 358, 365 (M.D. La 1999); <u>see</u> <u>also</u> *Georgia*

*Advocacy Office v. Borison*, 520 S.E. 2d 701, 703 (Ga. App. 1999);

P&As must have access to the consumers themselves in order to investigate incidents of

abuse or neglect. P&As have the right to access facilities in order to investigate. 42 U.S.C.

§10805(a)(3). It cannot be that Congress permits P&As to go into a facility and see an

individual but then allow a facility to deny the P&A access the individual's identity and, thus,

his or her records. Without the names and contact information of individuals, in many instances,

there simply can be no investigation, or the P&A's efforts are hampered so substantially that the

P&A's mandate cannot be fulfilled.

> ### D. Plaintiff is Entitled to Records of Consumers Who are Not Competent and Who Do Not Have a Guardian or for Whom the State is Their Guardian.

The Plaintiff is also entitled to access records of those individuals for whom there is

probable cause to believe have been abused and/or neglected and "1) who by reason of the

mental or physical condition of such individual is unable to authorize the system to have such

access or 2) who does not have a legal guardian, conservator, or other legal representative, or for

whom the legal guardian is the State." 42 U.S.C. §10805(a)(4)(B).[14]  This includes access to

---

[14]In full, this provision states:

the P&A shall have access to "all records" of any individual (including an individual who has
died or whose whereabouts are unknown)--
> (I) who by reason of the mental or physical condition of such individual is unable
> to authorize the system to have such access;
> (ii) who does not have a legal guardian, conservator, or other legal representative,
> or for whom the legal guardian is the State; and
> (iii) with respect to whom a complaint has been received by the system or with
> respect to whom as a result of monitoring or other activities (either of which
> result from a complaint or other evidence) there is probable cause to believe that

records of individuals who have died or whose whereabouts in unknown.  *Id.*

ULS has asked for the records of these consumers, but Defendants have not provided any records in response to this request.  ULS does not know which consumers fall under this section, and Defendants certainly should.  If ULS knew the names of consumers who are not competent to give their consent, it would clearly have the right to view those records given the fact that there is probable cause to believe the individual may have been subjected to abuse or neglect. The deplorable result of the Defendant's refusal to provide even names and contact information is that the Defendants can prevent the P&A from advocating on behalf of these consumers – especially vulnerable individuals in significant need of extra protection and for whom the P&A has been provided special access authority under the PAIMI statute.  This is obviously inapposite to what Congress intended; and if allowed to occur, shields Northwestern from the consequences of any wrongdoing.

By law, Defendants must give Plaintiff the records of those consumers who are unable to authorize access, have died, or whose whereabouts are unknown -- where there is probable cause.  42 U.S.C. § 10805(a)(4)(B).  Because the Defendants have either not made that determination or are simply refusing to provide the requested records, ULS must have the names and contact information of these individuals so that it can make a judgment about the ability of these individuals to authorize release.

---

such individual has been subject to abuse or neglect[.]

42 U.S.C. § 10805(a)(4)(B); 42 C.F.R. § 51.41(a) and (b).

**III.     Plaintiffs Have a First Amendment Right to Access.**

ULS, as the P&A, has a First Amendment right to communicate and consult with the

population it was created to serve.  *The Advocacy Center v. Stalder*, 128 F. Supp. 2d 358, 365

(M.D. La 1999); *Robbins v. Budke*, 739 F. Supp. 1479, 1485 (D. N. M. 1990); *Georgia Advocacy*

*Office v. Borison*, 520 S.E. 2d 701, 783 n. 6 (Ct. App. Ga 1999).

Defendants violate the First Amendment by refusing to provide ULS access to the names

and contact information of those the P&A was established to serve.  Without such information, it

is virtually impossible for ULS to locate these individuals, especially now that Northwestern has

closed.  Although DMH provided ULS with a list of names, ULS does not know if that list is

comprehensive nor does ULS know the information that was used to generate it.

As described by the Court in *Robbins*,

> The mentally ill are vulnerable to abuse and neglect because many mentally ill
> individuals have difficulty recognizing the concept that they have rights and will
> not necessarily identify even the most egregious abuse as a violation of their
> rights.   Even if cognizant of their rights, many of these individuals have difficulty
> assessing whether their rights have been violated and may have difficulty
> identifying the P&A as a resource to remedy rights violations.

739 F. Supp. at 1486.  Thus, an expectation that those with severe mental illness will always

initiate contact with the P&A is unrealistic and inadequate protection.  A system that refuses to

provide names and contact to the P&A effectively prevents the P&A from advocating for the

most vulnerable individuals unless the P&A is either a witness to the abuse or neglect or the

individual has the courage and capacity to report the abuse or neglect.

Because Defendants actions violate the First Amendment, this Court should enter (1) a

declaratory judgment that Defendants must provide names and contact information to ULS when

ULS asserts probable cause to believe the individuals have been subjected to abuse or neglect,

and (2) a preliminary injunction ordering Defendants to timely release names and contact

information about all individuals who received services from Northwestern from May, 2002, to

the present, for whom (1) staff at Northwestern or Northwestern itself acted as representative

payee for federal Social Security benefits or for whom (2) Northwestern held funds or had

authority over some or all of their funds.  The Courts should also enjoin the Defendants from

refusing to release such names and contact information in the future.

**IV.  Defendants Have Violated 42 U.S.C. §1983.**

In addition to violating the PAIMI statute, Defendants have also violated 42 U.S.C.

§1983.  The statute states:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes
> to be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . ..

*Id.*   As state actors,[15] Defendants are obliged to uphold the constitution and federal laws.  42

U.S.C. §1983.

Defendant's violation of the PAIMI Act and the First Amendment are violations of

§ 1983.  As stated in the statute itself, and upheld by courts, a violation of a federal statute by a

state actor violates 42 U.S.C. §1983. See *Mississippi Protection & Advocacy System v. Cotten*,

1989 WL 224953 (S.D. Miss.), *aff'd*,  929 F.2d 1054, 1059 (5th Cir. 1991); *Office of Protection

and Advocacy v. Armstrong*, 266 F. Supp. 2d 303, 313 (D. Conn. 2003); *Wis. Coalition for*

---

[15]Defendant has admitted that as Director of the Department of Mental Health, she was
acting under color of state law.  See *Defendant Martha B. Knisley's, Director, District of
Columbia Department of Mental Health, Answer to Complaint*, para. 10.

*Advocacy v. Busby*, No. 02-C-871 at 23 (Sep. 24, 2003) attached as Exhibit 21 to Motion for

Preliminary Injunction.

Although the Supreme Court has limited the reach of § 1983,[16] actions brought under the

First Amendment and the PAIMI statute clearly fall within its ambit.  In *Advocacy v. Stalder*,

128 F. Supp.2d. 358, (M.D. La. 1999), the court stated:

> The [PAIMI] Act is in itself void of any express statement by Congress
> which forecloses §1983 action. Neither does the [PAIMI] Act contain
> any comprehensive remedial scheme by which this court could imply an
> intent to foreclose §1983 action. Quite the contrary, the [PAIMI] Act,
> gives to an "eligible system" the right to pursue a legal remedy after the
> exhaustion of all available administrative remedies.

*Id*. at 365.  Because Defendants have violated ULS' First Amendment rights as well as the

PAIMI statute, 42 U.S.C. §10801 *et seq.*, they have violated § 1983.


**V.      Attorney's Fees**

Because Defendants have violated 42 U.S.C. §1983, Plaintiff is entitled to recover

attorneys' fees. 42 U.S.C. §1988(b) provides:

> In any action or proceeding to enforce a provision of sections . . . 1983 . . . the court,
> in its discretion, may allow the prevailing party, other than the United States, a
> reasonable attorney's fee as part of the costs . . ..

*Id*.  Because Defendants have impermissibly prevented and delayed the Plaintiff from receiving

information necessary to perform its statutory mandate to protect vulnerable individuals with

mental illness, ULS is entitled to attorneys fees' in addition to court costs and expenses.

---

[16]See discussion in *Armstrong,* 266 F. Supp. 2d at 312 - 13.

### Conclusion

For the foregoing reasons, ULS asks this honorable Court to grant its Motion for

Summary Judgment, issue declaratory and injunctive relief and awards Court costs, expenses,

and attorneys' fees.

Respectfully submitted,

_____
/s /
Mary Nell McGarity Clark
D.C. Bar #419732
Managing Attorney
University Legal Services – P&A
220 I Street, NE Suite 130
Washington, DC 20002
(202) 547-0198 x141
(202) 547-2662

Dated: November 22, 2004